MARVIN, Judge.
This appeal of a declaratory judgment involves title to portions of a 150-foot strip of land in Shreveport on which a track was maintained by a railroad for more than a hundred years until it was removed about 1962. Plaintiff’s title, which was recognized in the judgment, stems from heirs of the person who owned the property when the railroad was built. Defendants, who are appealing the judgment, generally are owners of city lots abutting the strip whose claims or titles stem from the railroad and adverse possession.[1] We affirm.
*131 This case is somewhat of a sequel to Bray v. Boyd, 286 So.2d 508 (La.App. 2d Cir. 1973), writ refused. Plaintiff’s principal stockholder was the plaintiff in that case. There the instrument by which it is claimed that the railroad acquired its authority over the strip was construed as a mere servitude. That decision must be reexamined in light of this record and the contentions made here relative to the later holding in Pure Oil Company v. Skinner, 294 So.2d 797 (La. 1974), that the plaintiff in a declaratory-petitory action who is not in possession, must make out its title good against the world.
The disputed strip was a part of a 145 acre tract acquired by Eliza Harris in 1841. She later married Matthew Watson and entered into a marriage contract, retaining the control and management of this, her separate property, which became known as Idlewilde Plantation. Matthew Watson, who of parenthetical historical significance was the sheriff of Caddo Parish, sold to the railroad in 1853, without the authorization of his wife, what Bray held was a servitude across the 150-foot strip.
Eliza Harris Watson, who died in 1869 leaving eight children, willed to three of her children the property which she described as lying between the railroad and a public road (Greenwood Road) to the north. The remaining property, partitioned into lots, was willed to all eight children. Lot 30 of the partition was described as and was shown on the partition plat as being south of the railroad. By these or similar descriptions, through mesne conveyances, the property was sold to people who eventually subdivided it into city lots. Idlewilde Courts, north of the railroad, was subdivided in 1925 by J. S. Swann and others. Bellview Subdivision, south of the railroad, was subdivided in 1913 by Thomas Bell.
A part of the plat of Bellview Subdivision, on which we show the relative position of Idlewilde Courts, Interstate 20, and the property in dispute here and in Bray, is reproduced:
Illustration to follow.
*132 [[Image here]]
The 150-foot strip was described in the 1853 instrument from Matthew Watson to the railroad as . .75 feet of land on each side of the middle of the line of said road as located by the survey . . .”
In 1916, the railroad quitclaimed to Thomas Bell’s heirs the southernmost 25 feet of the south half of the strip and these heirs in turn, quitclaimed to the railroad their interest in the remaining 50 feet. The subdivision plats show that the south line of the Idlewilde lots is the north line of the 150-foot strip and that the north line of the Bellview lots approximates the south line of the 150-foot strip when the alley shown on the Bellview Subdivision plat is taken into consideration. This alley was declared abandoned by the City in 1967.
In 1962 the railroad removed its tracks from the 150-foot strip. In 1964 the railroad sold and began to sell by non-warranty deeds, specifically described tracts in the 150-foot strip. Each railroad vendee generally was conveyed the property in the strip immediately corresponding to the subdivision lot or lots owned by the vendee. Plaintiff’s declaratory judgment action was filed in 1974, within 10 years of the date of the first such deed by the railroad.[2]
*133 Appellants, in an answer and reconven-tional demand below, sought to have plaintiff’s demands rejected and alternatively sought judgments for the taxes, improvements and expenditures. Here appellants do claim that they have acquired title by acquisitive prescription of 10 and 30 years even if plaintiff’s title be found to comply with Pure Oil and CCP 3654(1), 3653(1). The record, however, does not support this claim.
There is no evidence that any person other than the railroad possessed any portion of the north half of the strip so as to meet the requirements of a 30-year prescriptive title. Even good faith possession for more than 10 years, but less than 30 years, is not sufficient to establish a prescriptive title in the absence of a deed translative of title. C.C. Art. 3499.
A quitclaim deed may be the basis of the 10-year acquisitive prescription but such a deed, without a showing of good faith possession, does not alone establish prescriptive title. The 25 feet that was quitclaimed to the Bell heirs by the railroad in 1916 generally approximates the 20 foot alley shown on the Bellview Subdivision plat of 1913. Whether or not the public used the alley, the heirs of Thomas Bell are bound by his dedication in 1913 of the alley to public use and notwithstanding their quitclaim deed from the railroad in 1916, they cannot adversely possess against the public. La.Const. (1921) Art. 19, § 16; La. Const. (1974) Art. 12, § 13; Louisiana Highway Commission v. Raxsdale, 12 So.2d 631 (La.App. 2d Cir. 1943). The dedication of the public alley was not revoked or abandoned by the City until 1967, some seven years before suit was brought. In any event, defendants have not shown what, if any, possession was exercised by the Bell heirs after 1916 of the alleyway in question.
The evidence does not show that the south line of the strip encroaches into the Bellview Subdivision lots or vice versa. When the subdivision was platted, there may well have been 75 or more feet between the north line of the Bellview lots and the once existing centerline of the railroad. Plaintiff does not appeal from the judgment, however, excepting the north five feet of certain numbered Bellview lots from its recognized title. See footnote two.
The record is devoid of evidence showing any acts of adverse possession in the south half of the 150-foot strip before 1944 (or more than 30 years before this suit was filed by plaintiff). We are not hesitant then to conclude that appellants’ claims to title by acquisitive prescription are without factual support because plaintiff brought this action within 10 years of the date of the earliest deed by the railroad to any defendant.
This conclusion turns us to the reexamination of the 1853 instrument and the record title to the strip in the light of Pure Oil.
When the children of Eliza Harris Watson sold their interests in the property lying on each side of the railroad, they tacitly accepted their mother’s succession. C.C. Arts. 988, 994, 999, 1002, Southern Natural Gas Company v. Naquin, 167 So.2d 434 (La. App. 1st Cir. 1964). These children were seized or vested with the ownership of all of their mother’s estate, even though a succession was not formally opened or a succession judgment recorded on the public records. C.C. Arts. 1626, 940, 946. The rights of the now living heirs of Eliza Harris Watson in successions which were not opened or which were perhaps not even accepted by the then heirs were nevertheless transmitted to the living heirs by operation of law. C.C. 944, 1626; Succession of Martin, 234 La. 566, 100 So.2d 509 (1958); Succession of Platt, 300 So.2d 503 (La.App. 2d Cir. 1974).
Seizin operates so that at the moment of death, the ownership of a decedent’s property vests in the decedent’s heirs or legatees immediately by operation of law. See Oppenheim, 10 Louisiana Civil Law Treatise, Successions and Donations, *134 § 51 (1973); Lazarus, The Work of the Louisiana Appellate Courts for the 1971-1972 Term, Successions and Donations, 33 La.L.Rev. 199.
Plaintiff’s record title is intact from the original patent through the deed to Eliza Harris Watson. The next recorded deeds affecting the interest of Eliza Harris Watson in the 150-foot strip date from 1966 when plaintiff and his predecessor in title began acquiring the interests of the several heirs of Eliza Harris Watson.
 Plaintiff’s burden under Pure Oil was to prove a valid record title, good against the world. Defendants strenuously argue that plaintiff must fail here because there are no recorded judgments of possession in most instances affecting the interest of Eliza Harris Watson and her heirs in the strip. The title to property acquired by inheritance does not require recordation to be effective against third persons.
“The law of registry is inapplicable where the ownership of . immovable property . . . has been acquired by inheritance and title has become vested by operation of law.” (Citations omitted) Jackson v. D’Aubin, 338 So.2d 575, 580 (La.1976)
See also Lowry v. Atlantic Refining Company, 231 F.Supp. 775 (W.D.La.1964), aff. 363 F.2d 876 (5th Cir. 1966).
The interest of Eliza Harris Watson in the strip vested in her heirs at her death. Defendants here are not prejudiced by the absence or non-recordation of succession judgments. In this record, plaintiff has shown the descending lineage of the late Eliza Harris Watson and has shown its acquisitions from these many heirs, with the exception noted of Ms. Delano. Pure Oil does not abrogate these principles, which Jackson v. D’Aubin said have been “consistently held.” Accordingly, we hold that plaintiff has met the burden of Pure Oil and C.C.P. 3654(1).
OTHER CONTENTIONS
Defendants strenuously and astutely argue that the 1853 instrument from Matthew Watson to the railroad is susceptible of being construed either as a servitude or as a deed with a resolutory condition. They assert that if the instrument is ambiguous as they contend, the extrinsic evidence — a receipt to the railroad executed and filed in the public records by Matthew Watson in 1857 — establishes that the instrument was a sale of land with a resolutory condition.[3] The receipt shows the railroad paid more than twice as much as was recited as paid by Eliza Harris Watson when she acquired the 145 acre tract in 1841. We recognize the emphasis of defendants’ argument but must also note that Eliza Harris Watson acquired the larger tract from a relative and that similar arguments, excluding the receipt, were made in Bray. In any event, Matthew Watson had no title or authorization to sell. Our conclusions about the instrument in Bray, we believe, were correctly made and are adopted here. The receipt, which is expressly for a “right of way,” does not persuade us otherwise. The railroad acquired a servitude and nothing more.
The railroad possessed the strip precariously. C.C. 3510. In John T. Moore P. Co. v. Morgan’s Louisiana & T.R. & S.S. Co., 126 La. 840, 53 So. 22 (1910), it was said:
*135 “Because the Opelousas Railroad’s possession was of a servitude, and was continued unchanged, and, as a matter of course the possession of a servitude cannot mature into the ownership of the fee by prescription, no matter how protracted.
“ ‘The person enjoying a servitude is a precarious possessor. No matter how numerous may be the acts done by him animo domini, they cannot serve to show possession of the fee when the proof is made that the possession began by virtue of a title which conferred only a right of servitude.’ Carpentier et Du Saint, Vo. Pres., No. 1214.” 53 So. at 32. See C.C. Art. 3514.
Moore Planting Company also answers defendants’ contention that the railroad possessed 50 feet of the strip as owner after the 1916 quitclaim deeds from the Bell heirs.
“. . . it is very plain that for a precarious possessor, such as the holder of a servitude, to change the cause of his possession and inaugurate a new possession, it does not suffice for him to acquire and record a new title; but that he must, in addition, indicate by some outward acts of possession his intention to hold no longer under the old title but under the new; and that these acts must be of an unusually pronounced character. He must so conduct himself as to let the owner know that a new order of things has begun . . . ” 53 So. at 35. See C.C. Art. 3512.
The record shows no possession by the railroad other than as an owner of a servitude. It should also be noted that in at least two suits in the Caddo Parish District Court against the railroad, an instrument identical in form to the one here was held to have conveyed only a servitude.[4]
Defendants also contend that when the heirs of Eliza Harris Watson partitioned and sold to third parties the lands described as lying or being north of the railroad and south of the railroad, the land sold was from the centerline of the railroad and not from the right of way line. This contention, however, is not supported by the plat or the description of the lands in the partition proceedings of the Eliza Harris Watson estate nor by the deeds to third parties from the heirs of Eliza Harris Watson.
When property is shown to have been described or to have been bounded by a railroad and the deed does not indicate to the contrary, the boundary is deemed to be the right of way line of the railroad and not the centerline. Hanks v. Stutes, 85 So.2d 362 (La.App. 1st Cir. 1956).
We must also reject defendants’ argument regarding laches. Mere silence or delay does not cause the loss of title to property except by the effect of the laws of acquisitive prescription. Merritt v. Hays, 237 La. 557, 111 So.2d 771 (1959); Hicks v. Hughes, 223 La. 290, 65 So.2d 603 (1953). The railroad’s enjoyment of its servitude lasted until 1962. Plaintiff and its principal stockholder began to acquire the interests of the several heirs of Eliza Harris Watson in 1966, resulting in Bray v. Boyd in 1973 and in this case.
At appellants’ cost, judgment is affirmed.

. Numerous defendants were named in the original action brought in 1974. Some were known heirs of the person who owned the property when the railroad was built. Plaintiff succeeded in purchasing the interest of all defendant heirs except that of Virginia King Delano, who was recognized in the judgment as owning a V32 interest. Plaintiff, whose 31/32 interest was also recognized in the judgment, and Ms. Delano occupy the same legal positions and are appellees.
The disputed strip is south of and is generally parallel to Interstate Hwy. 20 through west Shreveport. Two city streets (Portland Avenue and Kings Highway) traverse the strip in the area in dispute. The judgment recognizes the public use of these streets.

. We should note that the railroad did convey two separate tracts in the strip to the City of Shreveport in 1963. The lower court held that the City and its vendee, Dale Allen Sumrall, met the requirements of 10 years good faith acquisitive prescription and excluded these particular properties from the judgment. Defendants H. E. Britt and Mr. and Mrs. James E. Sharp were also held to have acquired by adverse prescription the northerly five feet of their respective lots in the Bellview Subdivision. Plaintiff did not appeal nor answer de *133 fendants’ appeal and the correctness of this portion of the judgment is not before us. The judgment excepts from the plaintiffs recognized title the northerly five feet of lots 109 through 116 of Bellview Subdivision, along with other specifically described property.

. The instrument, quoted at length in Bray, is only partly recited here with emphasis:
“Right of Way ... I Matthew Watson . for and in consideration of the enhanced value accrued and hereafter to accrue to my land and other property by the passage of the . Rail Road through the same do hereby . sell . unto the . . . Rail Road . . . the quantity of seventy five [75] feet of land on each side of the middle of the line of said road as located by the survey aforesaid . The above sale of seventy five [75] feet on each side of the road aforesaid being for the right of way to said road through the land aforesaid. And the said . . . Rail Road Company are not to use the said land for any other purpose than the right of way.”
Bray expressly held Matthew Watson was without title and was not shown to have been authorized to sell.
The receipt reads:
“Received of the [railroad], Seven Hundred and Fifty Dollars in full for the right of say of said Company’s Rail Road through my land in the Parish of Caddo . . 5th Deer. 1857.
“(signed) M. Watson”

. Lawton v. Illinois Central Rlwy. Co., No. 142,-944 (1962); Tucker v. Illinois Central Rlwy. Co., No. 141,560 (1960), which holding was acknowledged in State, Department of Highways v. Tucker, 247 La. 188, 170 So.2d 371, 372 (1964).